798 A.2d 830 (2002)
Ashley REVESZ, a minor, and Lauren REVESZ, a minor, by Daniel and Kathy Revesz, Their parents and natural guardians,
v.
PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC., Appellant.
Commonwealth Court of Pennsylvania.
Argued February 12, 2002.
Decided May 21, 2002.
*831 Helen M. Gemmill, Harrisburg, for appellant.
Craig M. Lee, Pittsburgh, for appellees.
BEFORE: PELLEGRINI, Judge, COHN, Judge, and DOYLE, Senior Judge.
OPINION BY Senior Judge DOYLE.
The Pennsylvania Interscholastic Athletic Association, Inc. (the PIAA)[1] appeals an order of the Court of Common Pleas of Allegheny County that entered a preliminary injunction enjoining the PIAA from prohibiting Appellees Ashley and Lauren Revesz (the Reveszs) from participating in interscholastic athletics during the 2001-2002 school year.
The relevant facts are as follows. In March of 1999, the Revesz family purchased a home in Crafton, Allegheny County, in the Carlynton School District. Because Mr. Revesz was informed, in July of 2000, that his commission sales would be substantially cut in his job selling commercial time for a television station, the Revesz *832 family listed their home in Crafton for sale in the same month, before the Reveszs enrolled in Carlynton High School. In the fall of 2000, Ashley enrolled as a sophomore and Lauren enrolled as a freshman at Carlynton High School, and, during the 2000-2001 school year, the Reveszs played varsity basketball there.[2] After taking their home off the market in November 2000, and then putting their home back on the market in April 2001, the Revesz family sold their home and moved from Crafton in the Carlynton School District to Bridgeville in the Chartiers Valley School District on August 15, 2001. On August 22, 2001, the Reveszs transferred from Carlynton High School to Chartiers Valley High School and, because they were not immediately eligible to play interscholastic basketball for Chartiers under Sections 3 through 9 of the PIAA's By-Laws, on August 29, 2001, Chartiers submitted "Athletic Transfer Waiver Request" forms for the Reveszs.[3] The principal of Carlynton High School refused to certify that the transfer did not result from recruiting or for any athletic purpose because he believed that the Reveszs' transfer was at least in part for an athletic purpose, based upon advice given to him by Coach Michael McConnell. Therefore, the Western Pennsylvania Interscholastic Athletic Association Board of Control (Board of Control) held a hearing on October 1, 2001, to *833 consider whether the Reveszs' transfers violated the "Transfer Rule" found in Article VI, Section 11 of the PIAA's By-Laws.[4] The Board of Control found that the transfers were motivated, at least in part, for an athletic purpose and that the Reveszs were ineligible to participate in interscholastic athletics at Chartiers for a period of one year from the date of transfer, August 22, 2001. Chartiers appealed the decision to the PIAA's Interscholastic Athletic Association Board of Appeal (Board of Appeal) and, at a hearing held on November 16, 2001, the Reveszs' parents testified and submitted documentary evidence to establish the circumstances of their move to Bridgeville. By letter dated November 20, 2001, the Executive director of the PIAA informed the principal of Chartiers that the Board of Appeal had determined that the transfer of the Reveszs was based on the financial condition of the family as well as a desire to avoid playing basketball for the head coach of Carlynton. Specifically, the Board of Appeal made the following relevant findings of fact:
8. During the 2000-01 basketball season, Dan Revesz, the father of Lauren and Ashley Revesz, criticized Michael McConnell, the basketball coach at Carlynton, for not allowing Lauren and Ashley to shoot enough and regarding playing time for Ashley.
9. Mr. and Mrs. Revesz testified that Lauren and Ashley would often return from Carlynton practices and games in tears and were upset about how they were being coached.
10. In January, 2001, Mr. Revesz sent an e-mail to Michael McConnell in which he implied that his daughters may play for another school. He stated that they may play for "someone who appreciates what they can deliver to a program." He confirmed a conversation with Mr. McConnell where Mr. McConnell stated that "this has been [my] worst year of coaching because of me [Mr. Revesz]...."
11. In March, 2001, Mr. Revesz left a phone message for Mr. McConnell criticizing the lack of opportunities for his daughters to shoot.
12. In late April, 2001, upon the completion of the 2000-01 basketball season, the Revesz family listed their home for sale.
13. On July 2, 2001, during a summer league basketball game between Carlynton and Vincentian Academy, a confrontation occurred between Mr. Revesz and Mr. McConnnell. Statements were submitted from two witnesses to the event, Dori Anderson and Eric Mozetti. Neither is affiliated with Carlynton and both appear to have sufficient indicia of reliability that they were accepted by the Board of Appeal. Mr. Revesz was questioned concerning the statements and acknowledged that an incident did occur but denied the specifics as described *834 by Ms. Anderson and Mr. Mozetti.
14. The evidence established that Mr. Revesz loudly and vocally criticized Mr. McConnell as he was coaching Lauren and Ashley Revesz in the summer league game. The criticism was sufficiently loud that the opposing coach observed it. He also observed Mr. Revesz being physically restrained by other parents and coaches from attacking Mr. McConnell.
15. Immediately following the game, Mr. Revesz confronted Mr. McConnell and told him that he was a disgrace to girls' basketball. He again had to be restrained and escorted from the premises. As he left, he made derogatory comments to Mr. McConnell's wife.
16. Shortly after the confrontation between Mr. Revesz and Mr. McConnell, Lauren and Ashley Revesz withdrew from Carlynton High School and enrolled at Chartiers Valley High School.
(PIAA Board of Appeal Decision, November 20, 2001, Findings of Fact Nos. 8-16). Accordingly, the Board of Appeal determined that the conflicts regarding basketball between the Revesz family, and Mr. Revesz specifically, and Coach McConnell were a significant factor in the decision of the Revesz family to move out of the Carlynton School District; thus, it sustained the Board of Control's earlier decision.
On December 17, 2001, the Reveszs, by their parents, filed a Complaint and Petition for Preliminary Injunction. Subsequently, the Court of Common Pleas of Allegheny County heard testimony, which included the following:
1. The Revesz family had their house up for sale before the girls enrolled in Carlynton.
2. The Revesz family put their home up for sale in March and April of 2001. Immediately after the family moved into their house, Daniel Revesz, the Reveszs' father, suffered severe financial hardship, and he became apprised in August 2000 that his commission rate as a television sales representative had been downscaled by forty percent. Furthermore, his salary decreased by $175,000 in 2001. In July of 2001, he was faced with the loss of his job in ninety days.
3. On November 8, 2000, the Reveszs' mother, Kathy Revesz, suffered a heart attack and was not paid for the time she was out of work.
4. The Revesz family sold their house and moved into an apartment in Bridgeville on August 15, 2001 that was two blocks from where Mrs. Revesz worked, to ease the stress of the commute to work.
5. Mrs. Revesz's cardiologist recommended that she slow down her life style due to her heart attack.
6. Mrs. Revesz's family is located near where the Revesz family moved, and her family will help her to transport the Reveszs to and from basketball practice.
7. Coach McConnell acknowledged that the Reveszs would have been starters on the team.
(See Common Pleas Court Opinion at 3-4). On December 21, 2001, the Court of Common Pleas granted the preliminary injunction. In its written decision on January 23, 2002, it held that the PIAA's denial of the Reveszs' eligibility to participate in the varsity athletic programs at Chartiers for the 2001-2002 school year was "arbitrary and capricious," necessitating the grant of a preliminary injunction to prevent irreparable harm to the Reveszs. In reaching this conclusion, the Court stated that neither Article VI, Section 11 of the PIAA's *835 Constitution nor its By-Laws provides appropriate guidelines to students whose parents are compelled to move for financial reasons. The PIAA filed an appeal from that decision to this Court.
The issues for our review,[5] as framed by the PIAA, are as follows: 1) whether the trial court failed to apply the applicable standard by failing to assess whether the decision of the PIAA amounted to arbitrary and capricious discrimination, and 2) whether the Reveszs demonstrated a risk of immediate and irreparable harm, and, if so, whether such harm outweighed the harm that would be suffered by the PIAA if an injunction were granted?[6]
The PIAA first argues that Common Pleas applied the wrong standard of review. It asserts that there was no showing of arbitrary and capricious discrimination, that Common Pleas failed to consider whether the testimony presented to the Board of Appeal supported the decision that the transfer was motivated in part for an athletic purpose, and that Common Pleas substituted its own findings for that of the PIAA. The Reveszs argue, to the contrary, that the PIAA's so called "transfer rule" is so vague that imposition of the rule in this instance results in arbitrary and discriminatory enforcement.
The general rule and guiding legal principle with respect to high school athletic associations is one of judicial noninterference. Harrisburg School District v. Pennsylvania Interscholastic Athletic Association, 453 Pa. 495, 503, 309 A.2d 353, 357 (1973). In recognizing the policy of noninterference with the decisions of the PIAA, this Court has stated that "the remedy lies not with the courts but within the internal operating procedures of [the PIAA] which are controlled by the member schools." Pennsylvania Interscholastic Athletic Association, Inc. v. Greater Johnstown School District, 76 Pa.Cmwlth. 65, 463 A.2d 1198, 1202 (1983). A decision of the PIAA may be set aside by the trial court only if the action complained of is *836 fraudulent, an invasion of property or pecuniary rights, or it constitutes capricious or arbitrary discrimination. Id.
In Boyle, we addressed the issue of whether the PIAA's decision, which had determined that there was an athletic purpose motivating the transfer of a high school athlete from a public high school to a private high school, was arbitrary and capricious discrimination against the student. In that case, the principal of the school from which the student had transferred based his decision that the transfer was for an athletic purpose on palpable hearsay. We, therefore, determined that the transfer was unfair and arbitrary discrimination. We stated in Boyle that "[t]ransferring Students such as Boyle are placed in an untenable position, since no matter how thoroughly they establish that they transferred for a non-athletic purpose, PIAA may still deny them eligibility based on the arbitrary and unsubstantiated opinions of others when even their former principals have found no such purpose." Id. at 702.
In the case at bar, Common Pleas stated that Article VI, Section 11 of the PIAA's Constitution and its By-Laws fail to provide appropriate guidelines to students whose parents are compelled to move from one school district to another for financial reasons. It stated that to hold otherwise would "place upon [the Reveszs] an impossible standard and burden to demonstrate that an athletic intent was not a minute factor in making their decision." (Common Pleas Court Opinion at 5). For this reason, Common Pleas determined that the PIAA's denial of the transfer was arbitrary and capricious. We cannot agree with Common Pleas.
Here, the record reveals that the Reveszs would return from practices at Carlynton and from games upset about how they were being coached and that they sought to play for someone who would appreciate what they could deliver to a basketball program. The facts of the transfer fit squarely within the examples found in the By-Laws which exemplify when a transfer is for athletic purposes and inimical to the intent of the By-Laws, which is to "deter transfers which are in whole or in part for any athletic purpose." PIAA By-Laws, art. VI, sec. 11 (emphasis added). The first two situations listed in the By-Laws are applicable; where,
1. The student, or a parent or guardian, or an adult with whom the student resides, is dissatisfied with the student's position or the amount of playing time he receives.
2. The student, or a parent or guardian, or an adult with whom the student resides, has a problem with a coach at either a personal or professional level.
Id. There is no indication that the PIAA based its decision to deny the Reveszs eligibility to play interscholastic athletics on hearsay, or that it discriminated against the Reveszs in an arbitrary and capricious manner, or that the facts which entered into its decision were unsupported by substantial evidence.
The PIAA also argues that Common Pleas applied the incorrect standard for an injunction because the Reveszs failed to establish that they would suffer irreparable harm (not being permitted to play sports for one season), and, in any event, any harm suffered by the Reveszs would not outweigh the harm suffered by the PIAA through the grant of an injunction. We agree with the PIAA.
Although the Reveszs submitted recruiting letters from basketball programs at various colleges sent to Ashley, those letters alone are not sufficient to establish that the Reveszs would have suffered irreparable harm. Singzon. The *837 fact that a student is determined ineligible to play interscholastic sports for one year does not necessarily translate into a loss of opportunity to attain college scholarships. See Adamek v. Pennsylvania Interscholastic Athletic Association, 57 Pa.Cmwlth. 261, 426 A.2d 1206 (1981). Furthermore, the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm. Johnstown. To the contrary, the Reveszs may attend Chartiers, complement their academic studies by participating in intramural athletics, and play in recreational basketball leagues.
Accordingly, adhering to the principle of judicial noninterference and deference to the decisions of the participating schools through their interscholastic athletic association, and deciding that there was adequate substantial evidence in the record to support the decision of the PIAA, no evidence of discrimination, and that the Reveszs failed to establish irreparable harm, we reverse the order of the Common Pleas Court.

ORDER
AND NOW, this 21st day of May, 2002, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby reversed.
NOTES
[1] The PIAA is a nonprofit corporation, consisting of public and private high schools in Pennsylvania, the purpose of which is to allow member schools to adopt rules and regulations governing interscholastic athletic competition, some of which govern the eligibility of students to participate in interscholastic athletic activities.
[2] During the 1989-1999 and 1999-2000 school years, Lauren Revesz attended 7th and 8th grades at Holy Child School, where she was a member of the girls' basketball team. During the 1997-1998 and 1998-1999 school years, Ashley Revesz attended 7th and 8th grades at Holy Child School, where she also was a member of the girls' basketball team. During the school year 1999-2000, Ashley then attended 9th grade at Canevin Catholic High School, where she also played basketball. Again, in March of 1999, the Revesz family purchased a home in the Carlynton School District. The Reveszs played basketball in a Carlynton High School summer league team in 1999; however, following the summer league games, Lauren returned to Holy Child School and Ashley returned to Canevin Catholic High School. The Reveszs returned to play in the summer league at Carlynton in 2000. Because Mr. and Mrs. Revesz felt that they could not afford to have two children attend Canevin, they enrolled the girls in Carlynton for the 2000-2001 school year.
[3] Article VI of the PIAA's By-Laws concerns the eligibility of students to practice or participate in sports when transferring from one school to another. Sections 3 through 9 of Article VI set forth certain instances in which students are immediately eligible to transfer and play sports. These are circumstances of transfer that the Board of Directors have determined to involve relatively little risk of recruiting or athletic purpose. PIAA By-Laws, art. VI, Preamble. Article VI, Section 10(A) provides: "Except as otherwise provided in this Section, a student who is not eligible under a Section of this Article shall be ineligible to participate in each sport in which he participated within a period of one year immediately preceding the date of transfer." Id., art. VI, sec. 10(A). Article VI, Section 10(B) provides that a "student who is ineligible [to transfer] as a result of Section 11 [transfer for athletic purposes] shall be ineligible [to participate] in all sports." Id., art. VI, sec. 10(B). Furthermore, "[t]he period of ineligibility shall be one year from the date of transfer or the date of the District Committee decision...." Id., art VI, sec. 10(C). Pursuant to Section 10(D) of Article VI, the District Committee may waive Section 10(A) "in cases where the principal of the sending school and the principal of the receiving school inform the District Committee having jurisdiction over the receiving school, by completing and executing the official PIAA form entitled `PIAA Athletic Transfer Waiver Request', and orally at a hearing (if the District Committee having jurisdiction over the receiving school convenes a hearing into the transfer), that each believes that the transfer was not a result of recruiting and was not in whole or in part for any athletic purpose." Id., art. VI, sec. 10(D). In this case, the principal of Carlynton refused to certify on an Athletic Transfer Waiver Request form that the Reveszs' transfers were not the result of recruiting or for any athletic purpose.
[4] Article VI, Section 11 of the PIAA's By-Laws provides, in part, as follows:

Purpose and Intent of Article: Transfers for Athletic Purpose.
[A] District Committee may, after giving notice to his school and an opportunity to be heard to the student and his school, declare any transferring student ineligible for a period of one year from the date of transfer or the date of the District Committee decision, if the Committee finds that eligibility would circumvent the intent of this Article, part of which is to deter transfers which are in whole or in part for any athletic purpose.
A student who is not otherwise eligible under a section of this Article may be declared eligible by a District Committee if, following a hearing, it finds that the transfer was not in whole or in part for any athletic purpose.
PIAA By-Laws, art. VI, sec. 11.
[5] In their brief, the Reveszs assert that the regular basketball season for Chartiers will end on February 11, 2001, and, since Chartiers might participate in the basketball playoffs, the last date that the Reveszs could possibly play basketball would be March 23, 2002, which is the date of the state championship game. (Appellees' Brief at 18-19). Accordingly, they argue that it is highly unlikely, if not impossible, that the judicial process will be complete on or before March 23, 2002, given the right of the losing party herein to seek review in the Pennsylvania Supreme Court, and that, therefore, the matter is moot. However, the period during which the Reveszs are ineligible to participate in sports lasts for one year from the date of transfer, August 22, 2001. Therefore, the matter is ripe for our review until August 22, 2002.
[6] Our standard of review in cases involving the granting of a preliminary injunction is very narrow. Boyle v. Pennsylvania Interscholastic Athletic Association, Inc., 676 A.2d 695 (Pa.Cmwlth.), petition for allowance of appeal denied, 546 Pa. 684, 686 A.2d 1313 (1996). We do not review the full merits of the controversy, but rather determine, based on the record, whether there were any reasonable grounds which would justify the trial court's decision. Id. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial judge. Id. A preliminary injunction may be granted where certain prerequisites are met, such as: 1) when it is necessary to prevent immediate and irreparable harm which could not be compensated by damages, 2) when the greater injury would result by refusing it than by granting it, 3) when it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct, 4) when the activity sought to be restrained is actionable and when the injunction issued is reasonably suited to abate such activity; and 5) when the plaintiff's right is clear and the wrong is manifest. Singzon v. Department of Public Welfare, 496 Pa. 8, 10, 436 A.2d 125, 126 (1981).