## Hosack v. Pennsylvania Interscholastic Athletic Association

*Mitchell P. Shahen*, for plaintiff.

*Brian H. Simmons* and *Alan R. Boynton, Jr.*, for defendant.

DOHANICH, *J.*, January 16, 2009—This matter is before the court, in accordance with Rule 1531 of the Pennsylvania Rules of Civil Procedure, on the petition for preliminary injunction and accompanying complaint of the plaintiff, Justin Lee Hosack, a minor, by Marcee Buecker, his parent and natural guardian, seeking relief from the decision of the defendant, the Pennsylvania Interscholastic Athletic Association Inc. (PIAA), which has declared that Justin is ineligible to participate in interscholastic basketball for one year on the basis that his transfer from Hopewell High School to Lincoln Park Performing Arts Charter School was materially motivated in some way by an athletic purpose.

The plaintiff claims that he has suffered and continues to suffer irreparable harm in being deprived of the op-

portunity to participate in varsity basketball games by reason of the arbitrary and capricious action of the defendant and has been denied equal protection of the law. The defendant replies that its decision was supported by the evidence and is rationally related to the purposes set forth in its by-laws.

The plaintiff filed a complaint and presented his petition for preliminary injunction on December 12, 2008, requesting immediate relief without a hearing. Counsel for the defendant appeared in opposition. The court, after argument, refused to grant the requested immediate relief without a hearing and scheduled a hearing on the preliminary injunction for December 17, 2008. The court conducted hearings on December 17, December 22 and December 29, 2008, during which extensive testimony was taken and numerous exhibits received.

The PIAA is a non-profit, voluntary membership corporation open to all public high schools, intermediate schools, junior high schools and middle schools accredited by the Pennsylvania Department of Education, and all charter and private schools meeting the requirements for membership. Currently, 1,452 schools are members, consisting of 767 high schools and 685 junior high/middle schools. The PIAA operates pursuant to a constitution and by-laws adopted by its board of directors. One of the PIAA's primary purposes is to promote uniformity of standards in all interscholastic athletic competition among its members. The PIAA is organized into 12 geographic districts. Each school within a district elects a representative to serve on the district committee, which elects a chairman who serves as the district's representative on the state-wide PIAA board of directors.

The composition of the members of the board of directors and the district cmmittees consists of educators at various levels, including superintendents, principals, athletic directors and coaches, as well as sports officials and parents, who have significant contact with and interest in interscholastic athletics.

Hopewell and Lincoln Park are both located in Beaver County and are thus members of District 7, also known as the Western Pennsylvania Interscholastic Athletic League (WPIAL). Hopewell is a public school. Lincoln Park is a charter school emphasizing a curriculum of creative and performing arts, which is not traditionally available in public schools. One such offering is media arts, which includes a sports media and broadcasting program. Lincoln Park draws its students from 42 school districts, which pay tuition for each student who attends Lincoln Park. 45 Hopewell students are enrolled at Lincoln Park, for which Hopewell pays Lincoln Park $9,000 per student per year. Hopewell is classified as a Class AAA school with 930 students in the high school and offers its students participation in 30 athletic programs. Lincoln Park carries a Class A classification with a total student population of 472 for kindergarten through fourth grade and eighth grade through twelfth grade. Four athletic programs are provided at Lincoln Park, consisting of boys basketball, girls volleyball, and boys and girls golf. Lincoln Park's boys varsity basketball team is in its second year of competition and is coached by Mr. Chris Raso, who was formerly the girls varsity basketball coach at Hopewell prior to taking the position with Lincoln Park beginning in the 2007-2008 basketball season. Mr. Mark Javens, former boys varsity basketball coach

at Hopewell during Justin's tenth grade year of 2006-2007 and long-time friend of Mr. Raso, has been an unpaid assistant on Lincoln Park's basketball staff for approximately eight weeks. No intramural basketball program is offered at Lincoln Park.

Prior to reciting the factual background, the court must initially determine the appropriate evidence to consider. The PIAA argues that only the evidence presented at the hearing before its board of appeal should be reviewed, and that the plaintiff is not entitled to a de novo hearing. In support of this proposition, the PIAA cites the case of *Rottmann v. Pennsylvania Interscholastic Athletic Association Inc.,* 349 F. Supp.2d 922 (2004). In a high school basketball coach's challenge to the constitutionality of the PIAA's anti-recruiting rule based upon a violation of the coach's free speech rights, the court stated that it would not reweigh the evidence, reevaluate the credibility of the witnesses or otherwise provide the plaintiff a de novo review on the merits. However, after noting that for the most part the facts were not in dispute, the court indicated, "where necessary, we have found the appropriate facts after judging the credibility of the witnesses who testified at the preliminary injunction hearing." The court determined that the plaintiff's testimony was not credible and that the findings made by the PIAA were supported by the record. In the present case, no record of the proceedings conducted by the PIAA's board of appeal was made. A review of the various cases cited by both parties reveals that the trial courts in all of said cases accepted additional evidence, which was considered in rendering the decisions. Without the benefit of a record based upon the evidence presented at the hearing

before the PIAA's board of appeal, the court will examine all of the evidence presented during the hearings on the petition for preliminary injunction.

Justin, who is 17 years of age and enrolled in the twelfth grade at Lincoln Park, resides with his mother, stepfather, Theodore Buecker, brother, David Hosack, age 11, and two stepsiblings, ages 3 years and 9 months, in Hopewell Township, where they have lived since April 2006. Justin's mother and father, David Hosack, divorced in March 2001. Justin's mother married her present husband in 2004. Justin's father also resides in Hopewell Township with Trey Hosack, Justin's younger brother, who attends Lincoln Park in the ninth grade and is a starter on the varsity basketball team. Trey Hosack has lived with Mr. Hosack for approximately eight weeks after having previously resided with his mother and attended Hopewell where he completed eighth grade in the 2007-2008 school year. Trey transferred to Lincoln Park to commence the 2008-2009 school year. Lincoln Park did not offer eighth grade until the 2008-2009 school year. No custody/partial custody order exists between Justin's parents; however, Justin occasionally visits with his father. Justin's mother, as the custodial parent, has always made the decisions involving the children, keeping Mr. Hosack informed but not seeking his input or consent, since he has taken a passive role as a parent. Ms. Buecker is employed as a registered nurse at Allegheny General Hospital, which requires her to work significant hours of overtime. She recently gave birth to a child in April 2008.

Justin completed the latter portion of his ninth grade year at Hopewell during the 2005-2006 school year, when

the family relocated from Allentown, Pennsylvania. He continued to attend Hopewell for the 2006-2007 school year in the tenth grade, and the 2007-2008 school year in the eleventh grade until March 17, 2008. Justin participated on the junior varsity basketball team in the tenth grade, being coached by Mark Javens until January 2007, when Mr. Javens resigned and was replaced by an interim coach. In the eleventh grade, Justin was a starter on the varsity basketball team coached by Ron Rowan, whose past experience includes a successful college and professional basketball career. Justin maintained a good relationship with Mr. Rowan and had no complaints regarding playing time, since he played the majority of every game. The 2007-2008 Hopewell basketball team was a finalist in the WPIAL championship game and participated in the first and second rounds of the PIAA championship tournament. During the 2007-2008 basketball season, Justin was chosen in two tournaments for the All-Tournament Team and earned a place on the All Section Second Team. Justin is an average student without a history of other than minor disciplinary infractions at home, in school or in athletics. No problems were ever reported between Justin and his coaches or the athletic director at Hopewell. Justin's father attended most, if not all, of his basketball games, while his mother attended when her work schedule permitted. As a result of the action taken by the PIAA, Justin has not played in any games for Lincoln Park this season, although he has practiced with the team and attended all games as part of the team.

During the first week in February 2008, while Justin and his mother were viewing a tape delay of the varsity

basketball game between Western Beaver High School and Lincoln Park on television, they became aware during a half-time interview of the commencement by Lincoln Park of a sports media program. Justin advised his mother that he was very interested in sports media. As a result, Justin's mother contacted Lincoln Park to inquire about the sports media program. She was advised of an enrollment seminar scheduled for February 26, 2008. Justin and his stepfather attended the seminar, at which they were provided information regarding Lincoln Park and toured the facilities. Following the seminar, Justin spoke to a friend who had transferred from Hopewell to Lincoln Park to obtain a student's perspective regarding Lincoln Park. Shortly thereafter, Justin informed his mother, but not his father, that he desired to transfer from Hopewell to Lincoln Park to take advantage of the sports media program. Prior to this conversation, Justin and his parents had not discussed Justin transferring to another school. An enrollment packet was provided to and completed by Justin's mother and returned to Lincoln Park without the knowledge or consent of Mr. Hosack. The basketball season for Hopewell ended with a loss in the PIAA playoffs on March 4, 2008. Justin enrolled at Lincoln Park on March 17, 2008. The third grading period for Lincoln Park ended on March 22, 2008, and at Hopewell on April 2, 2008.

On March 17, 2008—Justin's first day at Lincoln Park—he met his physical education teacher, Michael Bariski, who was also the athletic director at Lincoln Park. Mr. Bariski, in speaking with Justin, inquired as to whether he participated in any sports and Justin advised that he played basketball at Hopewell. Mr. Bariski asked

if Justin intended to play basketball at Lincoln Park, to which Justin replied in the affirmative. Prior to the date of enrollment neither Justin nor his parents had any contact with the coach or athletic director at Lincoln Park. Justin was not introduced to Mr. Raso until the end of March 2008. Mr. Bariski provided Justin with the PIAA athletic transfer waiver request form to complete and return. Section one of the transfer waiver request form was completed by Mr. Bariski providing information regarding Lincoln Park and inserting the date of March 17, 2008. He instructed Justin to complete sections two and three of the form and obtain the signature of a parent. Mr. Bariski further questioned Justin regarding his reason for transferring to Lincoln Park. Justin answered that he was attracted to Lincoln Park by reason of the sports media program. Mr. Bariski was satisfied that the transfer was for academic reasons. The transfer waiver request form was subsequently returned by Justin indicating as the reason for transfer his desire "to pursue professional fields Hopewell could not offer me academically," and contained the signature of his father due to the unavailability of Ms. Buecker. Lincoln Park Principal Patrick Poling subsequently conversed with Justin regarding his reason for transferring and Justin echoed the same explanation as provided to Mr. Bariski. Based upon Justin's response, Mr. Poling found no reason to conclude that Justin had transferred for athletic purposes. As Mr. Poling explained, his opinion had been reinforced when he discovered that Justin had participated in basketball at Hopewell the prior year. Justin had transferred from a successful basketball program at the Class AAA level directed by a coach experienced at all

levels of basketball, where he had excelled, to Lincoln Park, a second-year program at the Class A level. Such a move did not indicate an athletic motive to Mr. Poling. After discussions with Mr. Poling and execution by Holly Castelli, dean of academics and acting principal in the absence of Mr. Poling, the transfer waiver request form was forwarded by Mr. Bariski to Hopewell by facsimile transmission on March 28, 2008, and returned from Hopewell via facsimile transmission on April 1, 2008. Hopewell's response, which was executed by Principal Michael Allison, provided that the transfer was motivated in some material way by an athletic purpose, citing dissatisfaction by the student or parents with the amount of playing time, a problem of the student or parents with the coach and a conflict of the student or parents with the philosophy or action of an administrator relating to sports.

As a result of Hopewell's position on Justin's transfer, Lincoln Park requested a hearing before the WPIAL district committee, which conducted a hearing on May 5, 2008. In attendance at the WPIAL hearing on behalf of Lincoln Park were Mr. Poling, high school principal, Mr. Bariski, athletic director, Chris Raso, basketball coach, Joseph Askar, Esquire, solicitor, Justin, his mother and stepfather. Justin and his mother were not represented by counsel, although they were advised of the right to have counsel at the hearing. Present for Hopewell were Mr. Michael Allison, principal, Mr. Donald Short, athletic director, and Mr. Ron Rowan, basketball coach. Justin's father did not attend. After hearing from the various parties, the WPIAL board of control issued its decision declining to grant eligibility to Justin

on the basis that the transfer to Lincoln Park was motivated in some material way by an athletic purpose relating to basketball. The board of control declared Justin ineligible to participate in basketball for a period of one year from the date of the transfer—March 17, 2008. Lincoln Park filed an appeal with the PIAA. The board of appeal scheduled a hearing for July 24, 2008, which was subsequently rescheduled for August 22, 2008. At said hearing, Lincoln Park representatives included Principal Poling, Athletic Director Bariski, Justin, his mother and grandfather. Justin and his mother did not have counsel present despite being advised of their right to be represented by counsel. Hopewell was represented by Principal Allison and Athletic Director Short. Justin's father was not present for the hearing. After hearing the evidence from all parties, the PIAA board of appeal, by a vote of 5-2, sustained the decision of the WPIAL district committee board of control declaring Justin ineligible to participate in basketball for one year from the date of his transfer on the basis that Justin's transfer from Hopewell to Lincoln Park was materially motivated in some way by an athletic purpose.

Eligibility of students to participate in athletics following a transfer from one school to another is governed by article VI of the PIAA by-laws (commonly referred to and hereinafter called the "transfer rule"). The preamble to the transfer rule in the 2007-2008 edition of the by-laws, which is applicable to the present case, outlines its purposes as follows:

"*Preamble*

"The intent of this Article is to (1) deter transfers that are, either in whole or in part, for any athletic purpose

and (2) deter recruiting that is, either in whole or in part, for an athletic purpose.

"The association believes that interscholastic athletics has a valuable role in the overall development of students and is a useful character building tool. PIAA believes further that, despite increasing societal pressures to elevate the role of competitive athletics in society and in the educational process, athletics should remain subservient to academics. Students who make decisions as to what school to attend based upon factors relating to athletics defeat this objective. Further, such decisions are detrimental to efforts to maintain competitive integrity and equity, to prevent athletic recruiting, and to instill school loyalty.

"PIAA recognizes the difficulty in preventing transfers that are motivated at least in part by an athletic purpose. Experience has shown that students can often disguise athletically motivated transfers and, in almost every situation, show at least some legitimate purposes for such transfers. PIAA further recognizes that district committees, without subpoena powers or investigatory staffs, may not be able to consistently and effectively police athletically motivated transfers. Further, efforts to measure how much of a factor athletics must play in a decision before it is considered improper is, while possible, also extremely difficult.

"In light of the above stated important educational and organizational objectives, and the challenges presented in attempting to prevent athletically motivated transfers, PIAA has adopted an approach that is intended to strongly discourage and deter students from transferring

for athletic purposes. The board of directors recognizes that this approach may, on occasion, result in a presumption of ineligibility for students who may not have actually considered athletics as a factor in transferring, and may conversely not catch all students who actually considered athletics as a factor. Consequently, the following Article includes a provision which provides the district committees with the power, under appropriate circumstances, to change eligibility status to meet the objectives of this Article."

Section 1 of article VI defines transfer as any situation in which a student enrolls at or attends a school after having previously attended any other schools. Article VI, section 2, provides for immediate eligibility upon transfer from one school to another in nine specific circumstances, none of which apply in the present case, while section 3 of article VI declares that a student not eligible under section 2 shall be automatically ineligible to participate in each sport in which the student participated within one year immediately preceding the date of transfer.

Section 4.A permits the district committee to review and waive any period of ineligibility in all sports following a transfer unless the district committee finds that there exists a reasonable likelihood that the transfer was materially motivated in some way by an athletic purpose. Article VI, section 4.D, defines a transfer which is motivated in some material way by an athletic purpose in four circumstances and by use of 10 nonexclusive illustrations, three of which were claimed to be applicable in this case. The pertinent portion of article VI, section 4.D provides as follows:

"(D) Transfers which are motivated in some material way by an athletic purpose are those transfers which would not have occurred but for a desire of the student or the student's family (1) to gain additional playing time; (2) to play for a particular school, coach, or team; (3) to avoid either playing for, or athletic sanctions imposed by, a particular school, coach, or team; and/or (4) to gain increased media or college exposure.

"The following is an illustrative, but not exhaustive, list of situations which may indicate athletic purpose:

"(1) The student, or a parent or guardian, or an adult with whom the student resides, is dissatisfied with the student's position or the amount of playing time which the student receives.

"(2) The student, or a parent or guardian, or an adult with whom the students resides, has a problem with a coach at either a personal or professional level.

"(3) The student, or a parent or guardian, or an adult with whom the student resides, seeks relief from conflict with the philosophy or action of an administrator or teacher relating to sports."

The court notes that the above standard to indicate an athletic motive represents a change from the previous language which spoke of transfers that are "either in whole or in part for an athletic purpose."

The following are the relevant findings of the PIAA board of appeal:

"(8) During the 2007-2008 basketball season, and despite both Justin's and the team's success, Justin's parents saw fit to contact or approach Mr. Short on no

less than five occasions to complain or comment about a variety of circumstances ranging from insufficient playing time and scoring opportunities for Justin, discriminatory imposition of team rules in a manner detrimental to Justin, or that the Hopewell coach 'had something against [Justin].'

"(9) The undercurrent created by Justin's parents, and in particular, his father, culminated on Friday, March 14, 2008, when Justin's mother arrived at Hopewell to announce her son's intention to transfer. She had in her possession a Hopewell-issued basketball warm-up jacket that she returned to Mr. Short, whereupon a tense discussion ensued between Mrs. Buecker and Mr. Short as to the reasons and possible implications of the transfer. Nonplussed by the possibility that Justin might be ineligible to participate in basketball if he were to transfer, Mrs. Buecker intoned that 'any place was better than Hopewell' or words to that effect.

"(10) For his part, Justin was aware that his eligibility to participate in basketball at Lincoln Park could be an issue after discussing his Lincoln Park admission with Mr. Poling.

"(11) Justin testified that he had an interest in sports broadcasting and believed that the best place to pursue a high school education in that field of expertise was at Lincoln Park.

"(12) Justin and his mother testified that his father was not involved in the decision to transfer to Lincoln Park. However, his father, who was clearly involved in Justin's basketball development, did not testify and was not available to corroborate or rebut this assertion. In light of the

extensive interaction between Justin's father and the basketball team, and his interest in Justin, the board of appeal found that it was likely that his father did have input into the decision and that Justin would not have transferred either without his father's consent or direction.

"(13) Article VI, Transfers and Residence, section 4.D, of the PIAA by-laws, provides that a transferring student may be declared ineligible 'if a finding is specifically made that there exists a reasonable likelihood that the transfer was materially motivated in some way by an athletic purpose relating to specific sports . . . .'

"(14) Material motivation of a transfer for athletic purpose can be found where it is the student's or the student's family to 'avoid either playing for, or athletic sanctions imposed by, a particular school, coach, or team . . .', and is often indicated where:

"(1) a parent . . . is dissatisfied with the student's position or the amount of playing time which the student receives.

"(2) a parent . . . has a problem with a coach at either a personal or professional level.

"(15) Although the modification to section 4 did not become effective until July 1, 2008, after Justin's transfer, it should be noted that, based on a number of similar matters, the PIAA board of directors has added an additional illustration of circumstances which suggests an athletic motivation. That additional illustration occurs when a student transfers in the middle of a marking period immediately before or after a season and without a change of residence.

"(16) In Justin's case, while it was apparent that he was not a disciplinary problem and genuinely is interested in furthering his education in sports broadcasting, it was equally apparent that basketball is an important component in his life, and that, too often and too regularly during the 2007-2008 basketball season, his parents saw fit to express their displeasure with the treatment accorded Justin by the coaching staff and athletic administration at Hopewell.

"(17) Almost immediately upon completion of the Hopewell basketball season, and at a point that was prior to the end of the marking period at both the sending and receiving schools, Justin transferred. The timing of this transfer was suspicious as there did not seem to be sound academic reasons for the transfer to have taken place before Tuesday, April 1, 2008, which was the last day of the third marking period at Hopewell; and that the transfer occurred within 10 calendar days of the completion of Hopewell's 2007-2008 basketball season."

The court's standard of review of PIAA actions was summarized in *Revesz v. Pennsylvania Interscholastic Athletic Association Inc.,* 798 A.2d 830, 835-36 (Pa. Commw. 2002), as follows:

"The general rule and guiding legal principle with respect to high school athletic associations is one of judicial noninterference. *Harrisburg School District v. Pennsylvania Interscholastic Athletic Association,* 453 Pa. 495, 503, 309 A.2d 353, 357 (1973). In recognizing the policy of noninterference with the decisions of the PIAA, this court has stated that 'the remedy lies not with the courts but within the internal operating procedures

of (the PIAA) which are controlled by the member schools.' *Pennsylvania Interscholastic Athletic Association Inc. v. Greater Johnstown School District,* 76 Pa. Commw. 65, 73, 463 A.2d 1198, 1202 (1983). *A decision of the PIAA may be set aside by the trial court only if the action complained of is fraudulent, an invasion of property or pecuniary rights, or it constitutes capricious or arbitrary discrimination. Id.*" (emphasis in original)

The *Revesz* court further indicated that the PIAA could not base its decision to deny eligibility to play interscholastic athletics on hearsay, citing *Boyle v. Pennsylvania Interscholastic Athletic Association Inc.,* 676 A.2d 695 (Pa. Commw. 1996), *petition for allowance of appeal denied,* 546 Pa. 684, 686 A.2d 1313 (1996), discrimination in an arbitrary and capricious manner, or upon facts unsupported by substantial evidence. *Id.* at 836. In considering a request for a preliminary injunction, a student is not required to demonstrate the PIAA's action barring participation in athletics was fraudulent, an invasion of property or pecuniary rights, or arbitrarily discriminatory. *Pennsylvania Interscholastic Athletic Association Inc. v. Geisinger,* 81 Pa. Commw. 421, 474 A.2d 62 (1984).

The plaintiff has not alleged that the PIAA's action is fraudulent or an invasion of property or pecuniary rights, however, he has claimed that the decision of the PIAA is based on hearsay, relies upon facts that were unsupported by substantial evidence and is arbitrary and capricious.

Testimony was offered by Hopewell Athletic Director Short of the statements made to him by Justin's father

on four occasions. Counsel for the plaintiff objected to the admission of these out-of-court statements as being hearsay. Defense counsel responded that said statements were not being offered to prove the truth of the statements but only to show that they were made by Mr. Hosack to Mr. Short. Rule 801(c) of the Pennsylvania Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Testimony as to an out-of-court statement is not hearsay if offered to prove, not that the content of the statement was true, but that the statement was made." *American Future Systems Inc. v. Better Business Bureau*, 872 A.2d 1202 (Pa. Super. 2005), *affirmed*, 592 Pa. 66, 923 A.2d 389 (2007) (complaints made by consumers to the defendant Better Business Bureau were not hearsay where admitted to show that the complaints had been received). In the present case, whether the statements made by Justin's father were true was not material to the issue in this case; rather, the fact that the statements were made directly bears on the ultimate determination. There-fore, the plaintiff's objection to the introduction of Mr. Hosack's statements to the athletic director was prop-erly overruled.

In order to determine whether the PIAA relied on facts that were unsupported by substantial evidence, the court will review the evidence in light of the findings made by the PIAA. The executive director of the PIAA testified that the board of appeal, in reaching its decision, relied on three factors in determining that Justin's transfer was motivated in some material way by an athletic purpose: (1) the statement of the Hopewell athletic director outlin-

ing five instances of conversations with Justin's parents, (2) the failure of Justin's father to appear and testify before the board of appeal, and (3) the timing of the transfer.

An examination of the statement read by the Hopewell athletic director at the hearing before the board of appeal describing the five incidents with Justin's parents reveals the following:

(1) On December 21, 2007, Justin arrived late for school and was told by Mr. Short, the athletic director, pursuant to a school policy, that he would not play in the basketball game scheduled for the same evening. Later in the day, Justin's father called the athletic director and indicated that if the same situation had arisen with respect to other players on the team, they would be permitted to play, and that Justin was being singled out. Justin's father further complained about him not getting enough playing time. Justin's mother also subsequently called the athletic director the same day regarding the action taken, and after an attempt by the athletic director to explain the policy, she complained about the Hopewell School District and the boys basketball team. Justin's father later called the athletic director and apologized for his statements.

(2) At the conclusion of the basketball game on January 29, 2008, Justin's father criticized an official regarding the manner in which he had called the game. The official reported the remarks to Mr. Short, the athletic director, who sought out Justin's father and indicated that his behavior was not acceptable. No mention of complaints regarding the coach or Justin's participation in

the game was made by Justin's father to the athletic director.

(3) On January 31, 2008, during the half-time intermission of a home game, the athletic director initiated a conversation with Justin's father to advise him that due to Justin's illness, Mr. Short, who is also the athletic trainer, recommended that Justin get ample rest and consume plenty of fluids, which advice Justin's father acknowledged. Justin's father then inquired as to whether Justin was not playing because of his illness, to which Mr. Short responded that the subject of playing time should be discussed with the coach. Mr. Hosack made no complaints regarding Justin's participation in the game or the manner in which the coach was managing his son.

(4) During a basketball game on February 4, 2008, the father telephoned the athletic director to complain about Justin's playing time and indicated that the coach had something against Justin. The athletic director was attending a family funeral at the time of the call and indicated that he was not able to discuss the matter with Justin's father at that time. However, Justin's father continued to speak with the athletic director for 10 to 15 minutes in an agitated tone.

(5) On March 14, 2008, Justin's mother appeared at the office of the athletic director to return a basketball warm-up jacket and informed him that Justin was withdrawing from Hopewell and enrolling at Lincoln Park for academic reasons. The athletic director informed Justin's mother that his eligibility to participate in basketball may be jeopardized due to the transfer, at which

time she advised that "it didn't matter . . . any place was better than Hopewell." Ms. Buecker did not express concern regarding Justin's eligibility to participate in basketball, even after being informed by Mr. Short of a possible question arising in the event of a transfer. This meeting prompted Ms. Buecker to forward correspondence dated April 7, 2008, to Timothy M. O'Malley, Executive Director of the WPIAL (plaintiff's exhibit 6) reiterating that Justin's transfer was for academic purposes.

Considerable reliance was placed by the PIAA board of appeal on the summary read by Hopewell Athletic Director Short regarding five separate dates on which he had conversations with Justin's parents, four of which were with Mr. Hosack and two of which were with Ms. Buecker. A careful review of Mr. Short's summary discloses that on only two occasions—December 21, 2007, and February 4, 2008—did Justin's father specifically complain about Justin's playing time. In the December 21, 2007 conversation, Mr. Short also indicated that Justin's father did not feel that team rules were applied fairly and that the athletic department was discriminating against Justin. Justin's father was also alleged to have said on February 4, 2008, that the coach had something against his son. The January 29, 2008 incident involved Justin's father criticizing an official on the manner in which he called the game and Mr. Short's explanation that this type of behavior was unacceptable and could result in Mr. Hosack being barred from attending future basketball games. Justin's father made no complaints regarding his son's playing time nor indicated any disagreement with the coach. Mr. Short initiated the con-

versation with Justin's father on January 31, 2008, recommending that Justin, due to his illness, should get plenty of rest and fluids. Mr. Hosack inquired of Mr. Short as to whether Justin's illness was the cause for him not playing, to which Mr. Short replied that the matter of playing time was at the coach's discretion. There is no indication in Mr. Short's summary that Justin's father was registering a complaint as to Justin's playing time.

Ms. Buecker also spoke with Athletic Director Short on December 21, 2007, regarding Justin not being permitted to play in the game scheduled for that evening. According to Mr. Short, Justin's mother complained about Hopewell School District and the boys basketball team. Ms. Buecker testified that after the policy regarding not being permitted to play in a game for being late for school was explained, she accepted the decision. When returning the basketball team jacket to Mr. Short on March 14, 2008, Justin's mother informed Mr. Short that Justin was withdrawing from Hopewell and enrolling at Lincoln Park for academic reasons. Mr. Short initiated the issue of Justin's eligibility to play basketball at Lincoln Park due to WPIAL regulations, and she replied that "it didn't matter . . . any place was better than Hopewell." In explaining this statement, Ms. Buecker testified that due to various other problems she experienced at Hopewell with respect to her son, David, obtaining an individualized education plan (IEP), as well as difficulties encountered by her son, Trey, which resulted in her having to make numerous telephone calls and actually going to the school and sitting in the office to get answers to questions, she became disillusioned with the Hopewell School District and made the statement in

frustration. Further evidence to support this statement is demonstrated by the fact that Trey also transferred from Hopewell to Lincoln Park. Ms. Buecker advised that she had never met Mr. Short prior to this encounter. No complaint was made by Justin's mother during this meeting regarding Justin's playing time, the coach or the athletic department, despite being told by Mr. Short that Justin's eligibility may be in question. The evidence further revealed that neither Justin nor his mother was aware of the complaints being made by Mr. Hosack to Mr. Short until the WPIAL hearing conducted on May 5, 2008, when Mr. Short read his summary to the board of control. Mr. Short also indicated that during the previous basketball season in Justin's tenth grade year, no complaints were registered by Justin or his parents.

The PIAA board of appeal findings 8, 9 and 16 relate to Mr. Short's contacts with Justin's parents. Finding 8 reads: "During the 2007-2008 basketball season, and despite both Justin's and the team's success, Justin's parents saw fit to contact or approach Mr. Short on no less than five occasions to complain or comment about a variety of circumstances ranging from insufficient playing time and scoring opportunities for Justin, discriminatory imposition of team rules in a manner detrimental to Justin, or that the Hopewell coach 'had something against [Justin].'" The evidence suggests that on only two occasions were such complaints or comments made. The remaining three conversations, according to the statement read by Mr. Short, made no mention regarding said topics. Finding 8 is therefore not supported by substantial evidence.

Finding 9 is not in accord with Mr. Short's summary of the meeting with Justin's mother on March 14, 2008. Mr. Short makes no reference to a tense discussion between them. He does, however, make specific reference to Ms. Buecker's statement that Justin was transferring for academic reasons, which the board's finding omits. Mr. Short also indicates that he introduced to the conversation the question of Justin's athletic eligibility, at which time Justin's mother said "it didn't matter . . . any place was better than Hopewell." The board's finding neglects to refer to the reason given for the transfer and that it didn't matter that Justin's athletic eligibility may be questioned.

Finding 16 characterized the interaction between Mr. Short and Justin's parents as: "too often and too regularly during the 2007-2008 basketball season, his parents saw fit to express their displeasure with the treatment accorded Justin by the coaching staff and the athletic administration at Hopewell." In view of the fact that the displeasure referred to occurred on just two occasions, this finding was not supported by substantial evidence.

The facts in the *Revesz* case, *supra,* which include the students complaining about their coach, the father criticizing the coach regarding playing time, the father stating his daughters might play for another school, the father openly criticizing the coach in public, and the father physically confronting the coach to the point of having to be physically restrained from attacking the coach, provide an example of ample evidence to substantiate athletic motive. The actions of the parents, of complaints on two occasions, in the present case fall well short of

the requirement of substantial evidence to demonstrate motivation in some material way of an athletic purpose. Also noteworthy in the instant case is that Justin made no complaints regarding the coach or athletic director and maintained a good relationship with both. He was not aware of the conversations of his parents with the athletic director. In effect, the conduct of his parents is being imputed to him.

The father's failure to appear to corroborate that he was not involved in the decision to transfer to Lincoln Park weighed heavily with the PIAA board of appeal, so much so, that an adverse inference was drawn by the board that his testimony would not have been favorable regarding his involvement in the decision. In finding 12, the board of appeal specifically found that "in light of the extensive interaction between Justin's father and the basketball team, and his interest in Justin," . . . "it was likely that his father did have input into the decision and that Justin would not have transferred either without his father's consent or direction." The court's review of the evidence discloses that the father's involvement, as the non-custodial parent who is not active in the decision-making for the children, consisted of attending all of Justin's basketball games, the four conversations he had with Mr. Short and signing the transfer waiver request form in the absence of Justin's mother. To characterize the above as extensive interaction between Mr. Hosack and the basketball team is not supported by the evidence.

In the case of *Pennsylvania Interscholastic Athletic Association Inc. v. Geisinger, supra,* two students requested a waiver of the eight-semester rule by reason of

their illnesses. The PIAA produced no evidence that the boys had not been ill or that their absences were for reasons other than illness, and requested the court to infer that the missed semesters were due to deficient scholarship because the students were absent from the school both before and after their illnesses and because they received poor grades in some courses. The court refused to apply the inference. Neither Hopewell nor the PIAA refuted the testimony of Justin and his mother that Mr. Hosack did not take part in the decision to transfer, but relied solely on the adverse inference for his failure to appear. As in *Geisinger,* the court, in the present case, refuses to draw an adverse inference for the father's failure to testify because the substantial evidence, which remains uncontested, indicates that he had no involvement in Justin transferring to Lincoln Park.

The final concern expressed by the board of appeal involved the timing of the transfer, being prior to the conclusion of the grading period at either school and within ten calendar days of the completion of Hopewell's basketball season. Although the transfer prior to the end of a grading period is not one of the illustrations contained in article VI, section 4.D of the 2007-2008 edition of the transfer rule, the executive director of the PIAA testified that this has been a consideration in other hearings and the 2008-2009 edition of the transfer rule was amended to include the timing of the transfer as a consideration. The board of appeal deemed the timing of the transfer to be suspicious as there did not appear to be any sound academic reason. Principal Poling from Lincoln Park testified that transfers to Lincoln Park in the middle of a grading period are not uncommon and that Lincoln

Park has on many occasions completed such transfers without incident. Ms. Buecker indicated in her testimony that the reasons for the transfer taking place when it did were that Justin desired to begin the sports media program at Lincoln Park as soon as possible and that she was imminently expecting the birth of her child. The court also notes that the transfer actually took place nearly two weeks following the conclusion of the basketball season. The timing of the transfer must also be viewed in light of the fact that Justin and his mother had discussed transferring to Lincoln Park well before the actual transfer date and prior to the end of the basketball season. Following their initial introduction to Lincoln Park by way of viewing the segment regarding the sports media program to be offered at Lincoln Park on television in early February, Justin and his stepfather attended the enrollment seminar on February 26, 2008, and Justin and his mother had made the decision to transfer prior to the conclusion of the basketball season. Justin, prior to the transfer, spoke with all of his Hopewell teachers regarding assignments to assure that there would be no obstacles to the commencement of classes at Lincoln Park. Justin and his mother have been consistent from the time of the enrollment seminar on February 26, 2008, to his statement on the transfer waiver request form, to his statements to both Lincoln Park Principal Poling and Athletic Director Bariski, to his mother's statement to Hopewell Athletic Director Short on March 14, 2008, to her letter of April 7, 2008, to the WPIAL, through the hearings before the WPIAL board of control, the PIAA board of appeal and the court at the time of the hearing on the preliminary injunction, that the reason for the

transfer was to pursue the sports media program at Lincoln Park. No evidence was presented by either Hopewell or the PIAA to rebut this evidence. The board of appeal, in its findings 11 and 16, acknowledged that Justin "had an interest in sports broadcasting and believed that the best place to pursue a high school education in that field of expertise was at Lincoln Park," and "genuinely is interested in furthering his education in sports broadcasting." Despite these findings and the substantial unrefuted evidence that the transfer was the result of Justin's bona fide interest in the sports media program at Lincoln Park, the board of appeal nonetheless determined that athletics played the material role in the transfer. The board's conclusion lacks the substantial evidence required to support it.

In reviewing the board's findings as to the three factors upon which an athletic motive was based, the court concludes that said findings were unsupported by substantial evidence.

In his complaint, the plaintiff has made an equal protection claim asserting that in other cases, the PIAA has approved eligibility for numerous high school student athletes who transferred from one school to another and the plaintiff has been treated differently in being declared ineligible. However, each transfer reviewed by the PIAA is examined on a case-by-case basis and is determined by the facts which are relevant in the specific circumstances. The plaintiff failed to present any evidence identifying cases decided by the PIAA in similar situations contrary to the result reached in the instant case, and therefore, the equal protection claim has no basis

upon which relief can be granted. *Pennsylvania Interscholastic Athletic Association Inc. v. Greater Johnstown School District,* 76 Pa. Commw. 65, 463 A.2d 1198 (1983).

The requisites for the granting of a preliminary injunction were summarized in *Pennsylvania Interscholastic Athletic Association Inc. v. Geisinger, supra* at 425-26, 474 A.2d at 64-65, as follows:

"A preliminary injunction is properly granted if it is necessary to prevent immediate and irreparable harm which could not be compensated by damages, greater injury would result from refusing it than by granting it, and it will restore the parties to the status quo existing prior to the defendant's alleged wrongful conduct. In addition, the plaintiff's right to a preliminary injunction should be clear. *Singzon v. Department of Public Welfare,* 496 Pa. 8, 436 A.2d 125 (1981); *Valley Center Inc. v. Parkhouse,* 62 Pa. Commw. 453, 437 A.2d 74 (1981). However, since a preliminary injunction is designed to preserve the status quo until the legality of the challenged action can be determined on the merits, one seeking a preliminary injunction is not required to establish his or her claim absolutely. *Fischer v. Department of Public Welfare,* 497 Pa. 267, 439 A.2d 1172 (1982)."

The PIAA argues that the plaintiff has failed to show that he is being irreparably harmed, and that granting the requested relief will result in greater harm to the defendant than if the plaintiff's request is denied. The PIAA cites *Revesz, supra,* which determined that the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm. This premise as-

sumes that substantial evidence supports the ultimate conclusion, which, in this case, is that Justin's transfer was athletically motivated in a material way. As indicated previously, the PIAA's primary findings lack such evidence. Absent the support of substantial evidence transforms a one-year suspension into irreparable harm which cannot be compensated by damages. This is especially so in the present case because the plaintiff is in his final year of high school and will be denied the unique opportunity to participate with his younger brother, who is also a starter on Lincoln Park's basketball team. The PIAA further contends that granting the preliminary injunction will adversely impact the PIAA, its members and student athletes, in that, such a decision will cause frustration and uncertainty among the member schools as to the transfer rule, permit Justin to play in the place of another athlete and tilt the competitive balance in favor of Lincoln Park. In addition, in the event of an appeal and reversal of the granting of the injunction, Lincoln Park will be required to forfeit the games in which Justin participates. In balancing the above concerns with the effect on the plaintiff of the PIAA's action, the court concludes that the irreparable harm to the plaintiff outweighs any injury to the PIAA, its members and other students.

Based on the foregoing, the court concludes that the plaintiff is entitled to a preliminary injunction and enters the attached order [not published herein].